JAN L. KLEINMAN and JAN H. KLEINMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kleinman v. Commissioner
Docket No. 10884-82.
United States Tax Court
T.C. Memo 1984-347; 1984 Tax Ct. Memo LEXIS 327; 48 T.C.M. (CCH) 463; T.C.M. (RIA) 84347; July 10, 1984. Wayne A. Smith and Scott W. Gray, for the petitioners. Michael K. Phalin, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $23,808 in petitioners' Federal income taxes for 1978 and an addition to tax of $1,190 under section 6653(a). [1] Matters in dispute are petitioners' entitlement to deductions *328 for a charitable contribution of stock, for promotion and entertainment expense and for automobile expense, and the addition to tax. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and exhibits thereto are incorporated herein by reference. Certain issues raised in the notice of deficiency are conceded by petitioners in the stipulation. Petitioners were resident of Phoenix, Arizona, during 1978 and at the time they filed their petition herein. At all times material hereto, petitioner Jan L. Kleinman (petitioner) was an attorney practicing in the personal injury field. Because of the low incidence of repeat business, he depended upon dectors, insurance adjusters, and prior clients for referrals. Petitioner frequently entertained referral sources by taking them to lunch, dinner, or sporting activities. Petitioner used an automobile for business purposes. On or about November 1, 1977, petitioner purchased a 1978 Cadillac Eldorado two-door coupe. During 1978, he used the Cadillac for *329 both business and personal purposes. Business use during 1978 included trips to Kingman, Arizona, a distance of approximately 183 miles each way from Phoenix, Arizona, to confer with clients injured in an explosion in Kingman. Such trips frequently involved overnight stays, with respect to which petitioner incurred meals and lodging expenses. During the years 1973 through 1976, petitioners acquired a total of 17,390 shares of stock of American Savings Life Insurance Company (American), a corporation transacting the insurance business in the State of Arizona subject to regulation by the Director of Insurance of the State of Arizona. Of that total, 4,118 shares were given to petitioner by his father, and 3,200 shares were purchased by petitioner on or before June 30, 1976, at prices of $1.50 or $2.00 per share. The balance of 10,172 shares represented 10 percent stock dividends distributed by American from time to time over the years 1973 through 1976. The only cash dividends paid during those years were $ .05 per share paid September 1, 1973; $ .05 per share paid September 18 1974; $ .04 per share paid September 1, 1975; and $ .035 per share paid september 1, 1976. No dividends *330 were paid during 1977 and 1978. On March 2, 1977, the Arizona Attorney General, on behalf of the Director of Insurance and the Director of Securities, filed a complaint in the Maricopa County Superior Court (the Superior Court) against American and several of its officers, directors, agents, and employees. Trial commenced on August 29, 1977, and concluded on September 8, 1977. In a minute order deted September 9, 1977, the Superior Court found that in connection with the sale of a stock and insurance package known as the "inflaction-beater," American and its agents "employed a device, scheme or artifice, including pyramiding of stock; that in connection with said scheme Defendants failed to disclose material facts which were necessary in order to make the statements in the light of circumstances under which they were made not misleading; that Defendants sold stock as an inducement to purchase insurance; that the Defendants in reporting their financial condition relating to the stock failed to follow generally accepted accounting principles." The Superior Court appointed Jerry Angle as its agent and, on September 21, 1977, issued operating procedures for the management and operation *331 of American under the supervision of Angle. Those operating procedures included the following: 7. Corporate Stock and Stock Records. In addition to complying with all aspects of the injunction entered by the Court in this action, American shall not make any changes of any kind on the stock records of the corporation without the prior specific approval of the Agent. Generally, approval will be given for the transfer of stock from one owner to a new owner only when the ownership change occurred by operation of law (i.e., inheritance, surviving joint tenant, etc.). In all probability, no other transfers of any kind will be allowed except under very unusual circumstances where equity would require that the transfer be authorized. On September 26, 1977, the Superior Court issued a formal Injunction and Order Appointing Agent of the Court. The injunction was directed at certain individual officers, directors, and other "insiders" of American but was not directed at individuals shareholders such as petitioner. Among the findings of the Superior Court with respect to the "inflaction-beater package" were the following: [S]tock dividends were declared at the rate of three 10 *332 percent stock dividends per year. The stock dividends were not based on the earnings of the company but were based on the continuous sale of stock. When stock dividends were declared, the company would transfer 10 cents per share, the par value, for each share from capital in excess of par to the paid in capital account. Under the program as it existed, the only way the company could have continued with stock dividends as it had been doing for the past four years was by the continued sale of stock. * * * Some of the investors were not interested or did not necessarily want to acquire the life insurance; however, they did desire to purchase the stock and in order to purchase the inflation beater package it was necessary to purchase both insurance and stock. The investors could have purchased the insurance without stock, but not the stock without the insurance. * * * * * * The following is an example of a typical inflaction beater package: The investor purchased a $20,000.00 life insurance policy for which he paid an annual premium of $600.00. Simultaneously, he signed a promissory note for $10,000.00 for the purchase of 2,000 shares of the company's stock at $5.00 per share. *333 The note was secured by both the stock and the policy and any and all proceeds of either. To induce the investor to purchase the inflation beater package, the investor was told that the company would re-purchase the stock (or assist in arranging a private sale) for $1.00 per share. * * * * * * Under the financial structure of the company as it existed, the investors only hope of getting even of ahead as was projected would be to continue to receive the pyramiding stock dividends coupled with the continued ability to sell the stock at $1.00 per share. Based upon further analysis of the relationship between the insurance and stock purchased by investors and the inducements to purchase, the Superior Court concluded that, although the insurance aspect of the company was in a sound financial condition, the stock operation was a divice, scheme, or atrifice to defraud. The Superior Court directed the agent, Angle, to present to the Superior Court financial statements prepared in accordance with generally accepted accounting principles and a plan for reorganization of American. On July 11, 1978, the Director of Insurance of the State of Arizona was appointed receiver for American, *334 and Angle was appointed deputy receiver. Administration of American by the receiver continued through the time of trial of this action. During the first several years of the receivership, no redemptions of the stock were authorized by the receiver. On April 28, 1982, Angle petitioned the Superior Court for authorization to redeem 13,684 shares of American stock for $ .50 per share. The Superior Court authorized the requested redemption by order dated May 5, 1982. During the period of the receivership, no arms-length sales of stock had been authorized by the Superior Court. On December 22, 1978, with knowledge of the difficulties confronting American, petitioner delivered endorsed certificates representing 17,390 shares of American to a representative of the Church of the Latter Day Saints. On March 10, 1980, Angle petitioned the Superior Court for permission to transfer the shares on the records of American. Transfer was shortly thereafter authorized by the Superior Court and was only then recorded on the books of American. Petitioners' tax return for 1978 was prepared by Nicholas W. Lees, CPA, with the assistance of Patricia Unruh, an employee of Lees, and Unruh's sister-in-law. *335 Petitioner delivered various records to Lees, including a sack of receipts for entertainment expenses. The sack contained some 1977 and 1979 receipts as well as duplicate restaurant tickets, stubs and charge slips, and slips without any dates or amounts included on them. On their Federal income tax return for 1978, filed on or about August 15, 1979, petitioners deducted $8,131 for expense relating to the 1978 Cadillac consisting of out-of-pocket costs of $2,496 and depreciation of $7,070 and reduction of the total by 15 percent for personal use; when added to $1,325 depreciation taken in 1977, the depreciation claimed in 1978 reduced the undepreciated cost of the 1978 Cadillac to $3,530. After telephone contacts with various stockbrokers and Angle, petitioner and Lees decided to claim a value of $2 per share for the American stock donated to the Latter Day Saints church. They claimed on Schedule A of the return a contribution deduction of $34,780, but they ignored the proviso immediately under that entry "[line] 22 Other than cash (see page 17) of instructions for required statement)." [2]
*336 It was customary for Lees to return to clients materials used in preparing such clients' tax return. Some records were returned to petitioner, and some were retained by Lees. Partial searches by Unruh and by petitioner shortly prior to trial failed to turn up records relating to the automobile and promotion and entertainment expense deductions in issue here. In the notice of deficiency, dated February 25, 1982, respondent disallowed automobile expenses in excess of $2,480 and entertainment expenses in excess of $3,239 as unsubstantiated. With respect to the contribution of stock, the notice of deficiency stated: It is determined that the deduction claimed as a charitable contribution in the amount of $34,780.00 to Brigham Young University, is not allowable because it has not been established that the American Savings Life Insurance Company stock had any value, or that the transfer of such stock was made during the 1978 tax year. Therefore, your taxable income is increased $34,780.00 for the taxable year ending December 31, 1978. Alternatively, it is determined that the value of the 17,390 shares of American Savings Life Insurance Company stock was $0.35 per share as of December 31, 1978. *337 ULTIMATE FINDINGS OF FACT Petitioners have failed to adequately substantiate any deductions for automobile expense or promotion and entertainment expense beyond those allowed by respondent. During 1978, petitioners made a charitable contribution of 17,390 shares of stock of American Savings Life Insurance Company. At the time of the gift, the stock had a value of $ .35 per share for a total value of $6,086.50. Petitioners underpaid their taxes for 1978, and such underpayment was due to negligence or intentional disregard of rules and regulations. OPINION Business Expenses
Petitioners have the burden of proving that they are entitled to deductions under section 162 beyond those allowed by respondent. Welch v. Helvering,290 U.S. 111 (1933); New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); Rule 142(a), Tax Court Rules of Practice and Procedure.
It is not disputed here that petitioner incurred travel and promotion and entertainment expenses in relation to his business. To establish the deductible amount of those expenses, however, as to the items other than local travel, he must substantiate the expenditures in accordance *338 with section 274. He has not substantiated the elements of each expenditure as required by the regulations. Section 1.274-5(a) and (b), Income Tax Regs. He has not presented adequate records as required by section 1.274-5(c)(2), Income Tax Regs. Nor did his testimony at trial contain "specific information in detail as to such element" and was not accompanied "by other corroborative evidence sufficient to establish such element." Section 1.274-5(c)(3), Income Tax Regs. The testimony of the preparers of the return similarly failed to establish the necessary elements and was the equivalent of bald assertions that the return was correct when filed. Such testimony is not conclusive or even persuasive. See Davis v. Commissioner,674 F.2d 553 (6th Cir. 1982), affg. a Memorandum Opinion of this Court; Wilkinson v. Commissioner,71 T.C. 633, 639 (1979). Neither petitioner nor the preparers of the return could explain how the records were lost, and none of the three could state for sure whether they were lost while in the possession of Lees or in the possession of petitioners. There is no justification for concluding that the loss of records was due to *339 circumstances beyond the control of petitioner, and he cannot, therefore, be excused from the strict requirements of substantiation. Section 1.274-5(c)(5), Income Tax Regs.
With respect to local automobile expense only, the Court has some discretion to estimate the amount of the expenditures, weighing heavily against the taxpayer whose inexactitude is of his own making. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). If we do so in this case, however, using petitioner's estimates of the local mileage driven by him during 1978 and the optional mileage rate during that year ($ .17 per mile), we would not arrive at a deductible amount greater than that allowed by respondent. The parties are in disagreement as to whether or not the depreciation computed by Lees on the business automobile was excessive in that it resulted in depreciation of the 1978 Cadillac to an amount less than a reasonable salvage value. Sections 1.167(b)-0(a) and 2(a), Income Tax Regs. There is inadequate evidence in the record from which the salvage value can be determined with any degree of certainty. To justify the depreciation claimed, however, petitioner had the burden of presenting *340 some evidence that would convince the Court that the salvage value was not more than $3,530. Charitable Contribution
We are satisfied from petitioner's testimony that he delivered the stock certificates endorsed in blank to a representative of the Latter Day Saints church on or about December 22, 1978. Although transfer of ownership on the books of American required approval of the agent, there was no absolute prohibition on transfer of the shares. The circumstances of the litigation involving American, however, would necessarily have an adverse impact on the value of the stock. No qualified expert testified as to the value of the stock under those circumstances, and the witnesses who gave opinions of the stock value agreed only that there were difficulties in arriving at a reliable value. We give little weight to petitioner's reference to sales at $1.50 or $2.00 per share and subscription prices of $5.00 per share prior to the institution of litigation against American. The prices paid by petitioner would have to be adjusted for stock dividends before determining his cost of the stock. As set forth in the findings of the Superior Court, the $5.00 per share price was payable *341 on terms over time, was tied in to purchase of insurance, and anticipated future value based upon future events, including regular stock dividends. Angle testified that American was never insolvent and that there was no danger of bankruptcy. The condition that he had to approve transfers of stock on the books of the corporation was intended to discourage speculation in the stock and exploitation of unsophisticated investors who might be induced to sell their stock for a fraction of its value because of the receivership. There were no known arms-length sales of the stock at or about the time of the gift or during the receivership. As of late 1978, Angle was refraining from giving any opinions of the value of the stock. As of the time of trial, however, he was more confindent that the audited financial statements prepared for the company during the course of the receivership were helpful in determining the value of the company as of December 31, 1978. The book value of the stock according to those statements was approximately $ .35 per share as of December 31, 1978. The redemption of shares in 1982 at $ .50 per share was based upon a book value of $ .50 shown on the financial statements. *342 At the time of trial, in December 1983, the book value was up to about $ .90 per share, and Angle estimated that, as of December 1983, the market value would be about $2.00 per share. David Allen, the office manager of American and a member of the family that controlled American from the 1960s through the time of trial, testified that he had computed adjusted book value of American stock as of December 31, 1978. Basically, Allen added to the balance sheet amounts for estimated increases in market value of balance sheet assets and estimated values of assets not shown on the balance sheet, such as the license to conduct the insurance business, which was valued by Allen at $250,000. In this manner, Allen calculated the book value of American as of December 31, 1978, to be approximately $1.77 per share if the company received fair market value for its assets, license, and charter. He also calculated the book value on the assumption that all investors in the "inflation-beater package" redeemed their shares of stock, thereby eliminating the receivables from those investors and the stock of those investors from the balance sheet. The alternate value computed by Allen in this manner *343 was approximately $1.03 per share. Allen then asserted that a reasonable multiple of book value to determine market value was 1.8, which he stated was a rule of thumb used in American's negotiations with other companies. It does not appear, however, that any such rule of thumb could be related to the circumstances of American as they existed in December 1978. In any event, Allen cannot be regarded as a qualified expert on whose opinion of value we would rely. He did not present any persuasive authority or appraisals to support his adjustments. In addition, there is no evidence that the adjustments made by Allen would have been made by or known to prospective buyers of American stock as of December 1978, and we conclude that it is unlikely that such prospective buyers would have paid more than the unadjusted book value determinable as of December 31, 1978. Allen confirmed that the unadjusted book value was approximately $ .35 per share. Based upon all of the evidence in the record and using our best judgment under the circumstances, we conclude that the value of American stock was $ .35 per share as of the time of the gift by petitioner, and that the charitable deduction allowable *344 for that stock during 1978 is $6,086.50. Addition to Tax
The evidence establishes that any records kept by petitioner with respect to his promotion and entertainment expenses were in a serious state of disarray when delivered to the return preparers; that the records necessary to a determination of his correct tax liability were not retained and were lost due to carelessness; and that the charitable deduction claimed on petitioner's tax return was not reasonable in light of the circumstances existing at the time and known to petitioner and his preparer. Petitioner has failed to porve that he or his preparer did not intentionally disregard the regulations relating to depreciation of automobiles and instructions for reporting of charitable contributions. If they were not actually aware of the applicable rules, considering their professional status and the amounts involved, they should have made inquiry. Further, they should have complied with the tax return instructions and secured an appraisal of the stock. Petitioner admitted that he did not review his return before he signed it. No explanation has been offered for the failure of petitioner to attempt to locate the records *345 before late 1983, either in relation to the audit of his tax return prior to the issuance of the notice of deficiency or in earlier preparation for trial of this case. We therefore reject petitioner's attempt to lay all blame for inability to produce the records, after a belated and incomplete search, on his preparer. The addition to tax under section 6653(a) is highly appropriate here and is sustained. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. The instructions require certain details concerning the property given and a signed appraisal as to values exceeding $200.↩